Good morning, your honors. May it please the court. My name is Darren Snyder. I'm here with my colleague, Sandeep Solanki. We represent Appellate and Defendants NDS. In this case, the plaintiff, Echostar, sought over $2 billion in recovery. They ultimately received less than $2,000. In other words, less than one millionth of the amount that they originally sought. In attorneys' fees and costs, they were awarded over $13.2 million, more than $6,000 for every dollar that they received in compensatory damages, statutory damages, or restitution. NDS, in contrast to Echostar, substantially achieved its litigation objectives in defending against these allegations. It defeated Echostar's single theory of liability, that NDS was somehow responsible for the piracy of Echostar's system, and it substantially defeated Echostar's claim for over $2 billion in relief. NDS's request for attorneys' fees, however, was dramatically reduced by more than 40%, and ultimately, it was awarded less than $9 million in fees. I know that your honors are familiar with the record. I'd like to focus on three issues. First, the district court's error in awarding Echostar a $5 million bonus. Second, the district court's error in decreasing NDS's fees by 50% based on the number of claims presented to the jury. And third, the district court's error in reducing NDS's attorneys' fees by a third or 25% based on the district court's erroneous conclusion that NDS had spent more time, its attorneys had spent more time than Echostar's attorneys. Turning to the first question, your honor, the district court's error in awarding Echostar a $5 million bonus. The district court's decision makes clear that that decision was based exclusively on the desire to achieve a result where Echostar received more in attorneys' fees than NDS. There is no standard articulated by this court or the United States Supreme Court in determining attorneys' fees that would allow that to be a consideration. Indeed, the jurisprudence, the standard that determines this calculation is well known. The court has to engage in a two-step process under Hensley. First, it must determine whether there are any unsuccessful and unrelated claims. Those should be excluded. And second, it must compare the results obtained to those requested. In fact, the U.S. Supreme Court repeatedly refers to that as a critical factor. There are other considerations that this court, for example, identified incur, and to the extent they are not included in that two-step Hensley analysis can also be considered. None of those factors, however, allow the addition of a $5 million bonus. Who was the district judge who was the first to determine? Your Honor, was that your Honor? Good guess. It's a very bad decision. I could regale you about that and show you just how crazy that was, but I won't do it today. Your Honor, the core factors that were identified in the Ninth Circus decision had actually been articulated earlier in a case called Johnson. And those factors were repeated in the United States Supreme Court's analysis in Hensley. But several courts have since recognized, including repeatedly... Not too many of those folks have done much practice of law and understand what really goes on in the world. But it's fine. It's work to the benefit of making law not a profession, but a business. Unfortunately, Your Honor, when the district court makes errors, it also results in an improper and unfair result, as it did in this case. Here, the district court tried to engineer a result that is not allowed under the law. No, no, no. You ask better questions. Why did the district judge, as you understand it, feel that that was the right thing to do? I don't know, Your Honor, and I think it would be improper for me to speculate about Judge Carter's intent. You're attributing a motive to the district judge, which I don't understand. You're saying he wanted to make sure that Echo Star got more attorney's fees than you did. And so he awarded the $5,000 bonus. If I am attributing a motive to Judge Carter, it is only because it is expressly articulated in his order. In his attorney fee order, in the excerpts of record at page 26, he explains in one paragraph his decision to make this $5 million bonus award. And all that he says is that because Echo Star has prevailed on some claims, it is entitled to more fees than NDS. So it's quite explicit in saying that he's going to award Echo Star more than NDS. Well, as I understand it, they got a the only damages, actual compensatory damages they received was what, $49.65? $45.69. And, of course, they got statutory damages for a technical violation of the statute. That's correct, for a total of $1,500. But they sued for millions and millions of dollars. $2 billion. All right. And as I understand it, they were claiming that your client was responsible for this attack on the security of their system when a person who called him or herself, what was it, Nipper 2000, something like that? Yes. Broadcast on the Internet a way to violate their security. And they attributed that to you folks. Yes. And they lost. That's correct. In order to solve that security problem, they had to spend, I think, about $100 million to improve their security. They claimed that they suffered $90 million in losses as a result of the piracy and spent $94 million to replace their security system. Now, somewhere along the line, they got into the trial of this case, another incident that occurred about a month before this Nipper person did what they did that involved an employee of your company, your client's company, who had heard a rumor about a way to pirate programming. And he did a test to determine whether that was true under supervision and found out it was. And how did that get before? It wasn't in their complaint, was it? It was not alleged in the complaint. It first came out during discovery and was the subject of certain e-mails. It came out during the deposition of Mr. Tarnovsky, who conducted the test. And I think that you all admitted that he did this. Absolutely, Your Honor. And I don't know whether you do it out of curiosity to see if there was some truth to this, to see if this has shed some light on your security situation. It's the latter, Your Honor, because it was important to NDS's security. The particular hack that was being investigated by Mr. Tarnovsky used an NDS card. And so he was determining whether an NDS card could be used to pirate EchoStar's system. And the misuse of NDS's card and NDS's security was part of his job function. And apparently this issue was then submitted to the jury, and the jury found that, well, we conclude from what they did that they found that that was a violation of the statute to do that, but they assessed the damages at the price of a one-month subscription to their service. That's correct. Those were statutory damages. There were three claims on which the jury returned a verdict nominally in the plaintiff's favor. On two of the claims, it found actual damages of $45.69. On the other two claims where statutory damages were available, the jury awarded the minimum amount of allowed damages. In the instance of the Communications Act, $1,000, and on one of the California Penal Code claims, $500. In both instances, the jury found that there had been a single violation of the statute, which is consistent with this P-1 test having been conducted by an NDS employee and found the minimum amount of statutory damages. It was actually his father, Your Honor. His father? Yes. But the other NDS employee he was working with for that test was his supervisor, John Norris. Okay. So Norris was there, too. Now, did they let Echostar know they were going to try to break into their system? Did they tell them in advance, Your Honor? Yes. No, they did not. When did they tell them? There was evidence in the record that Mr. Norris attempted to communicate with Echostar about problems with their security system, and Judge Carter specifically found in his findings of fact related to the 17-200 claim that tests of these type were routine, and he specifically found that Echostar's CEO, Charlie Ergin, had engaged in a similar test in demonstrating a defect in DirecTV's security system. Both of those are in the findings of fact on the 17-200 claim. Now, Echostar, I think from what you said, won on four claims. The jury found in their favor on three claims, Your Honor. Three claims? Yes. Okay. I'll change my four to a three. And there were mandatory statutory attorney fees that were to be awarded on any of those? Yes. On those three claims, the statutes read that the prevailing party should be awarded full costs. Now, there's a difference. One of those is a federal claim under the Communications Act, and we agree that Echostar is entitled to whatever fees were reasonably necessary to its limited success on the Communications Act claim. The other two claims are under the California Penal Code. And under California law, the determination of a prevailing party is determined at a practical level. Who achieved their litigation objectives? And it is undeniable that Echostar did not achieve its litigation objectives in receiving $45.69 in damages. Its litigation objectives were to show that NDS was responsible for the piracy of its system, and NDS defeated those claims. NDS, at a practical level, prevailed on all five of the California Penal Code claims, two of which were presented to the jury, and three of which had been disposed of before the case went to the jury. Okay. Now, let's go back just a little bit. Did the district court, in determining the fees to be awarded Echostar, focus its analysis on what it had done to win and become entitled to the federal statutory fees? Was there any analysis as to that? The only analysis, Your Honor, is in making a 50% reduction as to NDS's and Echostar's fees. The district court said that three of the claims that were presented to the jury went in Echostar's favor and three went in NDS's favor, where the jury returned a defense verdict. The court did not engage in the proper analysis of determining the amount of fees that were reasonably necessary to the outcome that was achieved, which is the second part of the Hensley test. And we believe that that actually is an error, and an error that the district court committed in reducing NDS's fees by an additional 50%. So what do you want us to do about that? Remand it to the district court with some kind of instructions as to what to do? I believe that there are certain errors, Your Honor, that do not need to be remanded. The $5 million bonus is an error and abuse of discretion that can be corrected by this court. Similarly, the decrease of 25%, the second decrease that the district court engages in, is an abuse of discretion under the prevailing standards and can be corrected. The 50% determination, candidly, Your Honor, I believe would have to be remanded because it would require a necessary determination of the amount of fees that were necessary to the success achieved under the Hensley standard. I'd like to reserve my remaining time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court, I'm Kate Frensinger. You're going to have to speak up. I'm sorry. I'm Kate Frensinger. This is my colleague, Cindy Ricketts, on behalf of the Appley Cross-Appellant Echo Store et al. You're Kate Frensinger? Kate Frensinger. Okay. You know, all you need to do is just speak in the center. In the center? That's kind of a recording system. Okay. And we have little things here we can turn that amplify your voice. Okay. I'll try to speak loudly. Thank you. I think, Your Honor, that the most important point here that the Court shall consider in this attorney's fee application and an attorney fee issue is the fact that attorney's fees are reviewed for abuse of discretion in this circuit. And in order to find an abuse of discretion, this Court must find that the district court either had an inaccurate view of the law or that the district court had a clearly erroneous finding of fact. And I don't believe that NDS's counsel has identified an actual inaccurate view of the law or a clearly erroneous finding of fact. The three elements that NDS's counsel points to as what he terms errors, not in fact I don't believe errors, but in fact are part and parcel of the district court judge's discretion in awarding attorney's fees to Echo Star. For example, the $5 million that the district court judge awarded to Echo Star was in fact part of his analysis of the Lodestar, the reasonable amount of fees to which Echo Star was entitled in light of the results obtained and all of the other factors in this case. The 50% reduction, again, was part of the analysis of what were reasonable fees in this case and part of that Lodestar analysis. Similarly, the 25% reduction of NDS's fees were part of that reasonableness analysis. Counsel, this lawsuit began with your claim that the defendant was responsible for a violation of your security which caused you to spend about $100 million. That was $94 million in improving your security, which resulted from a person who identified themselves as Nipper 2000 publishing some information that could be used to violate your security. Am I right? Correct. And you claimed in your lawsuit that that was the defendant's fault that that happened. Correct. But you were not able to prove that, were you? I disagree. Well, how do you explain the jury's verdict then of $49.50? And that's a very good question, Your Honor, and I think that gets to the root of part of the problem in this attorney's fee award that NDS takes issue with, which is the jury did not make any findings on the legal theory on which the liability was based. Well, that may be, but can we figure out what they did? I don't think that we can. Wasn't $49.50 the price of a one-month subscription which would relate to this P-1 test? I suppose it could. All right. It could, yes. All right. Now, did the district judge ever try to figure out how much of your time and expense and attorney's fees related to your claim for this revamping of your security, the $94 million? Did he ever try to figure out how much of your legal effort went into that as opposed to this other claim for this P-1 test? He did not do an hour-by-hour analysis. What he did and what's permissible in this circuit, in a case like this, it is as complex and difficult as this case was. I mean, voluminous bailing records, years of litigation. All right. What is so complex about trying to figure out how much all of this legal effort related to this P-1 test where the guy connected the card up and saw that it worked? The case was about more than just that. It sure was. Right, that P-1 test. And, in fact, it was about more than just proving whether or not NDS was responsible for the NIPRO test. But did you understand my question? Yes, I did. What would be so complicated about trying to figure out how much of your effort in legal expense was devoted to this one-time test that the defendant's employee performed to see if this hacking method would work? Because what Judge Carter did was he took more into consideration than that P-1 test. He took into consideration the overall success obtained by Echostar, which included the injunction and included, and this was key, this was important in this case. He got an injunction that said, don't do that again, don't do this kind of test again. Right? Correct. You didn't get any injunction that related to this massive security breach that you spent $100 million to fix, did you? There was no injunction about that, was there? Judge Carter based the injunction on the P-1 test. P-1 test, okay. However, there was... So, again, we're back to trying to figure out how much of your effort was devoted to the P-1 test. Right. But I think perhaps it's important to look at what Judge Carter considered specifically, and he clearly states in his order that Echostar obtained substantial success. Part of that substantial success also was Echostar's ability to uncover the illegal and, in fact, nearly criminal conduct by NDS because these were penal code provisions that they violated. The P-1 test. Exactly. Which kind of popped out in discovery. A lot of things pop out in discovery in a case that's this long. So, you know, perhaps Echostar didn't know about it at the beginning of the case, discovered it in the course of the case. As it turns out, it was criminal conduct that came to light in the course of the litigation. NDS is owned by a news corporation, which also owns a competitor of Echostar. So, in a sense, these were competitors, and it's a very fierce competition between these parties. The ability to bring to light this kind of conduct and to, in essence, force NDS to sever its ties with this underground community of pirates was an extremely important and difficult part of the case, but was actually proven by Echostar. And that's something that District Court Judge Carter recognized in his order specifically was part of his analysis of what were reasonable fees in this case. So it goes beyond just proving whether or not Mr. Tarnofsky tested the P1 card. All right. Thank you, Counsel. With respect to the $5 million what NDS terms a bonus, it's not a bonus. There's no language in the order that indicates that it's a bonus. What District Court Judge Carter did was analyze the various elements that go into what makes up a reasonable fee, and part of that was these results obtained. What he was required to do was to simply take into account these elements and then, in his discretion, based on his knowledge of the case and experience with the case, determine what's a reasonable fee. He did not fail to analyze the case. His analysis is quite clear in his order. And so in order to determine that he abused his discretion, he would need to determine that he had not, in fact, taken the steps that were required of him in order to determine this reasonable SP. Well, he apparently gave an extra $5 million to Echostar for attorney fees. Is that right? I don't... You say that wasn't a bonus. I don't believe it was an extra. I believe what he did was he determined this Lodestar amount by first cutting in half the attorney's fees, decreasing NDS's attorney's fees, and then putting this $5 million back into Echostar's fees. That was part of his analysis of what were reasonable. I don't believe it was an additional amount on top of what were reasonable fees. And that is within his discretion. It does not require an exceptional circumstance or a special analysis outside of what is required for the Lodestar analysis. So the 50 percent reduction, the 25 percent reduction, and then the adding on or the providing of $5 million were all part of this general discussion of what the reasonable fee would be for Echostar or... For both parties. For Echostar? For Echostar, for the $5 million, yes. Well, the 50 percent reduction applied to what? The fees of NDS? Both parties, Your Honor. Both parties. He had both parties' fees. The 25 percent reduction applied to NDS or both parties? NDS. NDS. And then a $5 million grant to Echostar. And that was all part of the fee resolution. That's correct. And these percentage analyses are permissible in this circuit based on, for example, this circuit recognizes that in a complex case like this with voluminous billing records and difficult time entries, the court can make percentage cuts if that is reasonable so long as the district court explains why they do it and it's based on the record. And in this case, that's exactly what happened. The court is simply required to apportion fees among the parties as it sees fit, and we know that from... presented on the case and what the different lawyers did and what their fee rates were and how it came up with the fees it was requesting. Did it make that kind of presentation? Echostar presented a fee application, yes, that included the hours by each of the various law firms and what it deemed to be reasonable fees in the case, but not necessarily.  I'm sorry to interrupt. That's okay. I'm probably going to say something a lot more important than I'm going to say, but did he then allocate those hours to the various claims or just say, well, Echostar won on three claims, NDS won on three claims, and I'm aware of all the work that was done and so here's the fee, but he apparently did not apportion the work to the particular claims. Is that right? I think this is a good opportunity for me to explain sort of how this is distinguishable from other cases in that he didn't apportion the hours, right? And that's the difficulty, I think, that we have in this order, but I think it's appropriate. He didn't apportion the hours in this case because there were so many, I think it would have been impossible for him to do that. Rather than apportioning hours to the various claims, he took the total fee requests of the parties and determined what percentage or what amount of the fees requested is appropriate for each of the claims on which the parties were successful or unsuccessful, and he determined in his discretion that Echostar was entitled to somewhere approximating 60% to 75% of its fees and NDS was entitled to 30% or 40% of its fees, and he reached that by reviewing not the hours necessarily, which is not required of him in a case like this, but the total fees and the quality of work, the amount of work that went into this case. And it's important to understand that this case was unique in that the parties spent not only a considerable amount of time preparing for the trial, but in the trial, which was a month long, were required to be in court long before the jury every day and long into the night, into the early morning hours during the week and on the weekends. And so District Court Judge Carter had an intimate understanding of what each of the parties' counsel was doing at all times, and he intimately understood on which claims the parties were successful and unsuccessful and why. Counsel, how many witnesses testified on the P1 test? I believe one or two specifically on the activities of the P1 test. I think Tardosky and his superior. Thank you. But the effect or the result of activities such as that, I think there were considerably more witnesses who testified on that matter. I would like to simply very quickly address Epostar's question. What was the total? The two of them and then people, other witnesses testified to what effect all that had? The total number of witnesses in the case, Your Honor? No, no, the total number of witnesses that testified as to what the effect of that test was. Because it was not a direct testimony on the P1 test, I don't know the exact number of witnesses who testified on issues related to the P1 test, but there were one or two that testified specifically. We can pretty much figure out that whatever the evidence was, the jury valued it at $49.65. Well, Your Honor, I think that there are other explanations for the outcome of the case. Besides the P1 test, I think that it could be that the jury determined, for example, a major issue in this case of causation under the Digital Millennium Copyright Act. Perhaps the jury determined that NDS may have been responsible for the conduct, but the conduct didn't cause the harm because there were prior acts of the system that also may have caused Epostar to replace its card swaps, not just the damage caused by the Nipper Post. So there was a causation issue, which would have been something that the jury would have read in its instructions and determined from the instructions. There could have been a territoriality question because some of the activity in the Nipper Post was undertaken in Canada, and the instructions explicitly stated that the jury needed to find that the conduct occurred in the United States in order to find liability. So there are more reasons why the jury could have found for NDS on this case. But they would have found all those issues against your client. That's correct. That's correct. But that does not necessarily mean that they did not believe that NDS was responsible for the Nipper Post. And that does not necessarily lead to the only conclusion that the P1 test was the theory of liability on which Epostar was successful. And with my last remaining seconds, I would just like to address Epostar's portion of the appeal, which simply relates to fees and costs, and really the important point here is this question of full costs and whether or not the statutes require full costs. We submit that the statute requires full costs and that non-taxable costs can't be categorically denied. And we'd simply ask that the court remand to District Court Judge Carter for a finding on the non-taxable costs, not just the taxable costs. Okay. Am I out of time? Are there any more questions? Any questions? No. Thank you, Your Honor. May it please the Court, I'd like to make four points briefly. First, there can be little doubt on the record that Judge Carter awarded Epostar the equivalent of a $5 million bonus as his purported application of the Kerr factors and not the identification of the Lowe star. If you look at Judge Carter's order in the excerpts of record at page 26, he identifies Kerr factors in the heading and beneath that, results obtained. There are substantial decisions from this Court and the United States Supreme Court, specifically in Blum, indicating that it is improper to include results obtained as an adjustment to the Lowe star because that is expressly included in the determination of what the reasonable fees are. Second, Your Honor, the characterization of the P-1 test as a significant part of the litigation is something that arises only after the jury's verdict and on this appeal. Before Judge Carter, in arguing for their attorney's fee award, Epostar described the P-1 test as an inconsequential fact that was discussed with only a few witnesses. Those are their words, as found in excerpts of record, page 104. There were only two witnesses who testified about the P-1 test, Mr. Tarnoski and Mr. Norris. I do not believe, and I was at the trial every day, that there was ever any testimony about the effect of the P-1 test because it was a test that was conducted only internally with NDS as part of their anti-security measures. Third, Your Honor, the district court did not engage in the proper analysis required by Hensley, which requires, first, that he exclude only unsuccessful unrelated claims and that, second, he then compare the results achieved to those that were sought. And by that standard, all of the claims that Epostar brought were related under their single theory of liability and NDS's success is unmatched. One final point briefly, Your Honor, regarding the full costs. We do not disagree that the Communications Act entitles a prevailing party to full costs, but there is no court cited by Epostar, and we are aware of none, that determined that the award of full costs divests the district court of all ability to review the reasonableness and documentation associated with those costs. In fact, a number of cases cited in our briefs are examples of courts doing exactly that kind of analysis to determine whether the costs were reasonably associated with the plaintiff's success and whether there is adequate documentation to support them. In this case, the district court did not find that plaintiffs were per se not entitled to full costs or non-taxable costs. Instead, the court found that their request for nearly $3.8 million in non-taxable costs, including the use of Lead Counsel's jet, was undocumented and was not reasonably connected to their success and therefore denied them. Thank you very much. Okay. So, Ms. Frenziger, you have the chair. Sorry, Your Honor. Do you have a jet? No, Your Honor. Lead Counsel at trial was a different law firm, not our law firm. But, in fact, it wasn't paying for the use. It was a reasonable approximation of what an airplane ticket would have cost. Well, I think it would be nice if you had one. I wish I had a jet, Your Honor. I wish. Okay. Yeah. Yeah, I disagree. All right. The matter is submitted.
judges: Graham, Pregerson, Thompson